May it please the court, William Peterson on behalf of Petitioner Dalgencorp, which I'll refer to as Dollar General. The results of the union election in this case were so close, four votes in favor of the union and two votes against, that a change of even a louder or maybe raise the podium. I think we've got a, there you go. Thanks. That'll help me. Thank you. Thank you, Your Honor. I'll speak up as well. My apologies. Thank you. Immediately following the election, two women who voted in favor of the union, Jennifer Miles and Joanna Derlin, explained that they wanted to change their votes, that their votes did not reflect an honest preference in favor of the union, but were the result of coercion and other misconduct by lead union supporter, Adam Price. Because of the close results of the election, a change of either vote would have been determinative and either instance of misconduct warrant setting aside the election. Let me start with the threat to Jennifer Miles to slash the tires of employees who voted no instead of voting yes. This is a serious threat as the board's precedent and this court's precedent recognizes. Employees take threats to their cars quite seriously. This court in Payless Cacheway Lumber recognized that the threat to slit a car's tires, even when made by a third party, created a general atmosphere of fear and coercion that justified setting aside an election result. Now to its credit, the board doesn't dispute this. Its failure to set aside the election result as a result of this threat is based solely on a finding that the threat occurred on November 11th, 72 hours before the start of the critical period when the petition for an election was occurred outside the critical period. You have here the testimony of two witnesses. You have the testimony of Jennifer Miles who says that the threat was made within the critical period. She has consistently testified to that. She testified that the threat was made after she volunteered to serve as the union's election watcher. That occurred November 27th and before she first told Kathy Reardon about the threat on December 4th. So that tells us the threat necessarily occurred between November 28th and December 3rd, or as she said in her statement written immediately following the election, within a week or so of the December 8th election. Opposed to that, you have the testimony of Adam Price, the employee who allegedly made the threat. Mr. Price has consistently denied making the threat at all. So if Miles is credited, the threat occurred within the critical period. If Price is credited, there was no threat. No witness said that the threat occurred outside the critical period. No evidence indicates that the threat occurred outside the critical period. Counsel, what about the timing of the employee party? Your Honor, Mr. Price denied making a threat at that event. And to be clear, the word party comes from the hearing officer. Ms. Miles did not describe this as a party. If you look at joint appendix page 220, she described it as a coming together of people that signed. Appendix page 234, she actually said this was an event that was originally scheduled to be at Mr. Price's home and then was moved to her house because of child care difficulties. Mr. Price described it as a meeting as well. That's appendix page 330. This is significant because the date that he points to, this November 11th date, he recalled because he found a text message from Ms. Miles saying, hey, come on over, I'm having a bonfire. I think that's going to be reconciled with the testimony of both Mr. Price and Ms. Miles that this was at a meeting to discuss organizing issues. Now, if Mr. Price had been equivocal at all, if he had said, look, I was drunk, I said some heated things about the union, I don't remember saying this, but if I did say something, I said it on this date, I think it might be possible to harmonize the witness's testimony in this manner. But Mr. Price has never equivocated in that manner. He has simply consistently denied making a threat. And so you end up in a position where you have no witness who has said there was a threat made outside the critical period. I'll point you here to the Sixth Circuit's decision in Revco. It's a case we cited in the briefing, although we didn't highlight this aspect of the case, but it involves a similar attempt by the board to harmonize two witnesses' testimony. There you had one witness who testified that she was seriously offered $100 by a fellow employee to vote in favor of the union. The employee who allegedly made the offer of $100 denied making the offer at all. The hearing officer looked at this testimony and concluded that the offer was made, but made in jest, and therefore refused to set the election aside as a result. The Sixth Circuit readily concluded that that finding wasn't supported by substantial evidence. No witness testified the offer was made in jest. Therefore, the board couldn't find that the offer was made in jest. Counsel, supposing all of this coercive conduct did take place, was it made by an agent for the union? We believe that it was. What evidence was there that there were manifestations by the union that would have created this agent situation? Well, there's no question that Mr. Price was asked to do certain tasks on behalf of the union. He distributed surveys. He inquired as to other employees as to whether they were of interest in supporting the union. He passed on dues information. And I think what's perhaps most telling here, when you look at his involvement in the election, Price was asked why the other employees, the two employees who voted against the union, weren't invited to join the text message. If you look at Joint Appendix, page 341, what Mr. Price testified is, they didn't get invited to this text message because I didn't think it was in their best interest. So what you have is actual authority to engage in certain activities related to the election. You also have the near incomplete physical absence of the union here. Mr. Myers visited three times, once on the day of the vote, once prior to the critical period, and only once within the critical period. So from our perspective, this is very similar to the Fourth Circuit's Kentucky-Tennessee Clay case, in which you have an employee contacting the union, and then the union really stepping aside and letting that employee take on the lion's share of the organizing work. So the fact that Myers is asking Price to engage in certain tasks, and then is almost certainly completely physically absent from the organizing process afterwards, and instead relies on Price to convey information, to check on Bloom, to be a conduit with the employees, all of these are indicia that Price was acting as an agent of the union or had a relationship with the union. Now, ultimately, though, we don't think it matters, either for the offer of money to the union or for the threat to Ms. Myers. We point you to the Payless Cashway Lumber Store Lumber decision. That's a case where a third party made a threat to slit tires that this court said created a coercive atmosphere that deprived the employees of their opportunity to exercise free choice. And I'll point to the Van Gorp decision as well. That's an earlier decision by this case where it talked about why it matters whether a third party or an agent has made a threat. And one reason for that is when the threat involves exercising the union's power, you see a lot of these cases where it's when the union comes in, we'll make things hard on you if you vote against us. When the union comes in, you'll be fired. When the union comes in, life's about to get a lot worse. Well, when you're talking about exercising union powers as a part of a threat, it matters whether you're speaking for the union. If a third party with no connection to the union threatens that the union is going to do something to employees who vote against it, then it's not a particularly credible threat. What this court recognized in Van Gorp, however, was threats made by third parties not subject to regulation by the board. Well, if they're physically violent, they actually might be more serious coming from third parties rather than union agents. You don't need to be a union agent in order to slit someone's tires. And we'd say the same thing here with the bribe. So let me turn briefly to the offer of money to Ms. Derlin, unless... I'm sorry, turn to what? The offer of money to Ms. Derlin. Yes. Okay. Do you think the board dealt correctly as a matter of law with that gift situation? I mean, did it apply the correct standard to determine whether that gift undermined the election? No, Your Honor, it did not. Because what the board said, when you look at the hearing officer's finding, it is that the conduct was not objectionable because it was not conditional. And if you look at cases time and again, have said that unconditional offers are nonetheless improper. This court, the Supreme Court, in the severe decision, I'll quote the D.C. Circuit in front baking, that the act prohibits both crude and subtle forms of vote buying. And so what the courts have... What's the ultimate legal standard that you want applied to this gift or loan or whatever it is? We would say that, quoting King Electric, a union is forbidden from providing voters anything of tangible economic benefit during the critical period. If the offer was made by a third party, we would say that offers made by fellow employees in connection with an employee's vote about the union are impermissible during the critical period. All right. But you still have to show that there's some impact on the election. Isn't that right? Yes, Your Honor. So that's another part of your argument, presumably. It certainly is. And that's a key point here. And it's why we're not suggesting that a ruling in our favor would open the floodgates. That given the closeness of the election, this was a determinative vote. One vote. Yes, Your Honor. So if this had been a 6-0 election in favor of the union, we wouldn't be up here complaining just about the offer of money to Mr. Erlen. But doesn't, even if we accept all of your arguments that you've made so far today, doesn't the record support that both of these women had pro-union feelings, the various text threads that they were involved in? Well, certainly in the bribe context, it's well established that offers of money are objectionable even when made to union supporters. And if you look at the testimony of both women, both of them said, this misconduct affected my vote. And this is not an after-the-fact invention by Ms. Miles. I mean, recall the testimony that Ms. Miles approached Kathy Reardon on December 4th, four days prior to the vote. This was credited. She told Ms. Reardon that she wanted to withdraw her union authorization card, but that she was afraid to because of retaliation by Mr. Price. And that specifically mentioned the threat to slash her tires. So this was not something that simply came up after the fact. She was afraid. She had decided she was going to vote no. That's what she told Ms. Reardon on the 4th. Ultimately, when she got in the ballot box, she said she was just too scared. So you're suggesting we should have a remand for fact-finding on the influence that this transaction had on the election? We certainly wouldn't object to a remand. We do think, we would ask you to go further. We do think there are cases in which the court has rendered in circumstances like this. Again, I would point you to the Sixth Circuit's Revco decision. That was a case in which the board treated the offer of money as being in jest. This court, not this court, I'm sorry, the Sixth Circuit simply said no, the threat was the offer of money was serious, and so we need to render a judgment setting aside the election as a result. I agree a remand might be more usual, and we certainly wouldn't object to that if that were the relief. But I'll say I think it's to the credit of employers and employees that we don't see many cases involving third-party offers of money in this context. It is an act that is so obviously and so clearly incorrect and inconsistent with the sort of laboratory conditions in which these elections should be conducted that it apparently almost never occurs. We only found one decision, that was the Teo Pepe case from the Fourth Circuit remanded to the board that involved an offer of money by a third party, and there I'll point out the Fourth Circuit articulated a rather bright-line test. Counsel, I'm sorry, we're about to run out of time. I have one more question, and that is, there was a, was the issue with respect to the application of ideal electric case or principle raised below? Not specifically, Your Honor. We raised the general point consistently that the threat was relevant and required the threat and required the election to be successful. But you now argue on appeal essentially that this rule shouldn't be applied mechanically and that was a legal error. Is that correct? We're making that argument on appeal, Your Honor. I would think of it as ultimately an attack on the board's ultimate factual conclusion that this was a fair election and whether the board properly considered the evidence. But it was as a legal principle that they were applying essentially that these kinds of, these kinds of incidents that lie outside a particular time period are of no relevance. That's a difficult question. The board has occasionally described it as a hard and fast legal rule. I think the Third Circuit's characterization of ideal electric is perhaps more accurate, that it's simply a rule of... But I think, I'm sorry, but I think your objection is that they applied it too mechanically here. Is that right? Yes, Your Honor. Okay. And so I see it simply as a rule of considering and evaluating the relevance of evidence. I understand. Not as a bright-line rule. And so the board simply erred in acting too mechanistically when applying what should be a flexible rule. Unless the panel has further questions, I'll reserve my remaining time. Very well. May it please the Court. My name is Valerie Collins and I represent the National Labor Relations Board. Ample evidence in the record supports the board's finding that the company simply failed to meet its burden here, as it must, in showing that the election results should be discarded. I'm going to start with the alleged threat and then move on to the inducement allegation. But I would like to first kind of highlight to the Court that there is a reason why the board has such a high standard in disregarding or throwing away election results. And it's highlighted in this case. Secret ballot elections have long been established as the most surefire way that you're going to get uncoerced statements. So here we have witnesses who do kind of offer conflicting testimony both before and after the election. They kind of do things that in our view doesn't make a ton of sense, like volunteering to be an election observer and then saying that you don't support the union. And the reason why the board has this high standard is for this reason. Because the election is secret ballot. There are procedures in place that effectuate employee free choice. So for the alleged threat, I would like to just very quickly touch on the company's Ideal Electric challenge. Ideal Electric is absolutely not before this Court. This Court is jurisdictionally barred from hearing this challenge. They in no way raised Ideal Electric challenge before the board. The whole point of Section 10E of the Act is to essentially give the board notice that arguments like this are going to be raised on appeal. The company simply did not raise Ideal Electric. It didn't argue that there should be an exception. An established exception applied. It didn't argue that this case is super special and there should be a new exception. It didn't even cite Ideal Electric. And this isn't the type of case where you have later on the board raising something that maybe the hearing officer or the ALJ did not raise. The hearing officer's opinion clearly relies on Ideal Electric, and yet they still refuse to challenge that. They challenge the factual findings that the hearing officer made. And those are well supported as well. And I wanted to just go through some of the conflicting evidence that the hearing officer was in the best position to assess the witness's demeanor and make these types of credibility determinations found. But first, there's no dispute here that if this threat occurred, and there's no factual finding either way because it essentially didn't matter, but if this threat occurred, that it was at this party gathering at Miles' home. And there's also no dispute that Price only attended one such gathering at her home. So there's a reasonable inference here based on undisputed evidence that if this happened, this would have been the time. And there's also no dispute that there's only one witness, and that's Mr. Price, who was able to testify to a specific date. He was able to look at his phone and say, I've only been to this type of event at her house once, and that was on November 11th. And essentially, so there's other testimony, but it's all based on this court would need to disregard all of these credibility determinations. What evidence puts the threat being made at her house? Excuse me? So Miles testifies that this threat occurred at her home. So that's what that's based on. So there's no allegation that it was at work or something like that. And that's one of the things that the hearing officer relies upon because it was kind of like this special occasion. There'd only been, at least Price had only been there once. This was not kind of like a water cooler kind of discussion where it was mentioned in passing. And that's one of the reasons why the hearing officer decided to credit Price because not only did Miles kind of shift in terms of the timing on when this was made, but there were other things going on that would have served as kind of a flag that you could easily remember. So this was around Thanksgiving. She wasn't able to say, was this before or after the holiday? Was it before or after she volunteered to be an election observer? There are all these others where she was just really kind of vague on her dates. She also testified specifically that, and I just wanted to quote this, that she was not sure of the timeline because everything happened so quickly. She first says a couple weeks out, then one week out, and all of these are very significant. The hearing officer also relied heavily on her demeanor, and demeanor-based credibility determinations are kind of like the high point of deference because the hearing officer really is the only person who is best in the best position to make that type of determination. And so the company's argument, for example, that, oh, well, maybe she wasn't being argumentative and it doesn't look like it's obvious that she was argumentative from this testimony, that kind of highlights the point here. Yeah, it's hard. It's hard to look at just a transcript and to see snark or all of those types of kind of demeanor-based issues that come up, and the hearing officer was in the best position to make those determinations, and the company has not pointed to anything that shows that those were improper. And I guess, just to compare, Price, he found to be credible. It is accurate. I would agree with the company that that factual finding was not made because of the date that the hearing officer found, that if this threat occurred, it occurred on November 11th. That is before the union filed its representation petition, and generally speaking, there are very narrow exceptions, but under IDEA Electric, the board is really going to start looking at the time of the petition, and that rule makes sense. You know, there are union campaigns that last a really long time, and so it's a rule of convenience. It was not applied just mechanically. There's just no flag anywhere in this case that it should not apply. Counsel, why isn't that a legal conclusion that we could review de novo? I'm sorry, excuse me? Why is that not a legal conclusion that we could review de novo? Which conclusion? Application of IDEA Electric. Well, it was never raised. I mean, this court under Section 10e of the NLRA, it clearly states that a party has to preserve these types of arguments if it's entirely fitting for the board to make this type of determination. So essentially, what the company is asking this court to do is not only just kind of evaluate these facts for the first instance and seeing if an exception is met, but in its reply brief, it actually goes a little bit further and suggests that a new exception may need or should be carved out. This goes to the heart of industrial relations. Congress has clearly given that role to the National Labor Relations Board, and if they wanted to challenge it later, that's fine. I mean, that happens all the time. But in terms of making a new legal rule under the Act, that the board would argue is squarely in its court. What was the hearing officer's finding with respect to whether the threat was made? There is no finding. So that's the way I read it. Why was there all this discussion about, all this factual discussion about the testimony if it was not relevant? Why would he or she have gone through all that trouble? So the hearing officer had to kind of go through all of that analysis to find the date. So all of the discussion about the testimony goes to the witness's credibility, and based on those credibility determinations, the hearing officer found that if this occurred, it occurred on the 11th, but it needed to kind of go through all that to get to that date, but it didn't actually need to make the actual factual finding itself. I would like to just, before I go into the inducement allegation, I would like to mention just a couple things about Mr. Price's agency status. It is remarkable that the company is arguing that what Mr. Price did is sufficient to elevate him to be a union agent. What he did here is pretty much the most typical behavior that you see. There's usually one or two employees who are the passionate ones, who are kind of the ones trying to convince their coworkers, the ones reaching out, getting information, sharing information. This is really standard, and here you have not just his behavior is kind of ordinary, but you have Myers, who is the business, the actual union, the union, reaching out and talking to all of these people. They were in constant contact with each other, which is a huge point that you don't see in other cases in which agency status is found. The union actually even sent another person to the location, so when he wasn't able to go on one of these trips, he sent someone else. The other people who were in this text messaging did the exact same things that Price was doing. When Myers asks the employees, hey, what's going on with this? Who's keeping up with this guy? Miles is the one who responds. Yes, she says, I think Adam has chatted with him, but she's the one responding. The union asks, hey, can someone give me Ms. Derlin? Can you give me an update on what happened at this event? Yes, she does. That's Ms. Derlin. Can anyone serve as a union observer during the election? Miles volunteers. The only thing that's kind of separate is the fact that Price volunteered to give out these surveys, and even that was introduced by the union. They knew this was coming. What do you guys want to see in a contract in the future if we win? There's really nothing remarkable that Price did whatsoever that would establish any type of agency status, particularly because the union didn't fail to do anything. When you have these types of cases with apparent authority, there needs to be something or even maybe a lack of action on the base of the principle. Here we just don't have that. It's just not even close. Moving on just briefly to the $100 inducement allegation, the accredited evidence shows that Price offered money to Derlin because she needed it. I think that it's important to highlight the context in which this allegation arose. The whole reason why Price and Miles and Derlin wanted to reach out and wanted to be represented for the purposes of collective targeting is because the company had slashed their hours. There were these two new employees who got the other hours, and they were upset. This is undisputed. Miles testifies that this is where they were all at. Ms. Derlin testifies that she was in a tight spot financially, in part because of her hours being cut. Everybody knew this, and she was going through a difficult time. The accredited evidence established that Price offered her money because of that. At no point does accredited evidence show that there was any type of tit for tat or even a wink and a nod. There's just nothing there. She was struggling. These people hung out together, and he said, hey, I can give you $100 or loan you $100 or whatever. At no point was that tied to anything that would impact her free choice. At the time, it doesn't even really make sense. Is it necessary to show that in order to invalidate the election? Is it necessary to show that there was a tie, explicit or implicit, to the vote before? Why? Isn't the question whether it influenced her vote? No. Derlin's vote? No. The question is there absolutely has to be some type of link. That's what I'm talking about, a link between that event and her vote. It's a factual question. You're talking about there has to be a link at the time the transaction occurs? It might not need to be in real time, but at some point, if it's not explicit, there has to be something implicit. There has to be something where it's like, I'm giving you this for this reason in some way. Even if it's not kind of directly stated, it would need to be... I agree with you, that would be sufficient. But my question is, would it be necessary in order to undermine the result? There's only one vote here that made the difference. I mean, one vote made the difference. Anybody's one vote made the difference. But so if you can undermine the legitimacy of one vote, the election is overturned. Well, unfortunately for the company, that's just not the standard. It was their burden to show this. There is evidence that you could be arguing different ways, different plausible ways to look at this evidence. It highlights the standard of review here. It's not necessarily, is it plausible? Okay, perhaps. But did they meet their burden in showing that these elections and the secret ballot elections should be thrown in the trash? Absolutely not. Well, I don't think they think that's their burden. I think their burden is to show that this transaction affected the result. And I don't see that legal principle in operation in this record. So I see my time is almost up. Can I briefly answer your question? So it absolutely is the company's burden before the board to show that the election should be thrown out. Here, the hearing officer relied on credited testimony that established that there was no inducement. That as a factual matter, that was a factual finding. And this board, or excuse me, this court reviews those factual findings of the substantial evidence standard. My time's elapsed. I would respectfully request that the court enforce the board's rule. Thank you. Thank you, Ms. Collins. Thank you, Your Honor. Four points in a brief time. First, the timing of Ms. Miles' testimony about whether she could say it was after she volunteered to be an observer. I'll point you to joint appendix page 248. She testified that it was subsequent to her serving as an observer. One illustration here, imagine the criminal context. You have a victim who says the defendant robbed my bank in March. You have the defendant who says, I didn't rob the bank. And in fact, the only time I went to her bank was in January. You couldn't take that testimony and find that the defendant robbed the bank in January. It's the same thing the board did here. Agency rules, agency in this context is applied liberally, as we cited in the briefing. And my friend has not cited any case in which the union organizer had so little personal physical involvement as Myers did here. It's understandable it was a small bargaining unit. Third, with the money, I'll point you to the Freund Banking co-decision. You cannot unconditionally provide a benefit in a way that tacitly obliges the employee to vote for the union. Even if there's no express quid pro quo, courts have recognized that when you make this sort of gift, you're creating a tacit obligation. Here, when the lead union supporter is going up to another employee, offering them a gift that they have never offered before, it is clearly creating a tacit obligation. Finally, the distinction between the board and the hearing officer, the hearing officer actually was right about one thing. He was right that the coming together occurred after the cards were signed. The hearing officer, everyone admits, got the date that the cards were signed wrong. The hearing officer's finding that the threat occurred on November 11th was based on his admittedly erroneous finding that the cards were signed on November 8th. Thank you. The court appreciates your arguments today and briefing. The case is submitted and will be decided in due course.